UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

                    Plaintiff,

        -against-                              **Case No. 25-CR-67 (AHA)**

MATTHEW HONG,

                    Defendant.

**SENTENCING MEMORANDUM
ON BEHALF OF DEFENDANT MATTHEW HONG**

Kelly T. Currie
Lisa Nicole Umans
CROWELL & MORING LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone: (212) 223-4000

*Attorneys for Matthew Hong*

## TABLE OF CONTENTS

I.      **Introduction**………………………………………………………………………1

II.     **Procedural History**………………………………………………………………1

III.    **Matthew's Personal Background and Characteristics**……………………………...3

    **A.**     Upbringing, Education, and Mental Health…………………………………..3

    **B.**     Post-College Events………………………………………………………5

    **C.**     Current Situation………………………………………………………7

IV.     **Sentencing**………………………………………………………………………**8**

    **A.**     Overview of Sentencing Factors………………………………………………8

    B.     The Section 3553(a) Factors………………………………………………10

        1.      Nature and Circumstances of the Offense and History and Characteristics of Matthew Hong………………………………………10

        2.      Applicable United States Sentencing Guidelines Range………………...12

        3.      Purposes of Sentencing………………………………………………12

V.      **Conclusion**………………………………………………………………………**14**

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Gall v. United States,*
    552 U.S. 38 (2007)..................................................................................14, 15

*Kimbrough v. United States,*
    552 U.S. 85 (2007)......................................................................................14

*United States v. Booker,*
    543 U.S. 220 (2005)....................................................................................14

*Rita v. United States,*
    551 U.S. 338 (2007)....................................................................................15

*United States v. Adelson,*
    441 F. Supp. 2d 506 (S.D.N.Y. 2006).......................................................15

*Nelson v. United States,*
    555 U.S. 350 (2009) (per curiam)..............................................................15

**STATUTES**

18 U.S.C. § 3553(a) ............................................................................... *passim*

Defendant Matthew Hong respectfully submits this Sentencing Memorandum to assist the Court in determining an appropriate sentence in this matter.

## I.     Introduction

On April 3, 2025, Matthew Hong stood before Your Honor, having accepted full responsibility for the crime of which he was accused, and pleaded guilty to one count of making false statements under Title 18, Section 1001 of the United States Code. Matthew remains penitent, respectful, and ready to accept the consequences of his actions. As Matthew has a bright future ahead of him, he hopes the Court will allow him to take advantage of the work he has already done to rebuild. Accordingly, in light of all the factors pursuant to 18 U.S.C. § 3553(a), we respectfully request that Matthew be sentenced to a term of probation, which is no greater than necessary to achieve all of the goals of sentencing in this case.

## II.    Procedural History

Approximately two months after Matthew graduated from college and one month before he was slated to begin his first job at the United States Department of Labor, Bureau of Labor Statistics ("BLS") in Washington, D.C., the COVID-19 pandemic hit. Instead of interacting with and working alongside his colleagues in person, like many across the country, Matthew was forced into a period of isolation. As the Court might imagine, assimilating into the workforce as a recent college graduate under such conditions was difficult. Matthew's significant struggles with mental health, which had followed him throughout his teenage and young adult years, also worsened.

It was amid these circumstances, and about a year into his work at BLS, that Matthew decided to apply for a job at Company A, a global financial institution headquartered in New York City, where he hoped to grow his career. After accepting the job at Company A, Matthew's

1

debilitating self-doubt kicked in, and he was unsure whether he would be able to "cut it" at the new job.  Consequently, Matthew kept both positions.  He hoped that his attempt at a career in the finance world would not be an abject failure—but if it was, he could fall back on his job at BLS. A heavier workload was also appealing to Matthew, as it would allow for an escape from his continued struggle with depression.  Over the approximately one-year period that Matthew held both positions, he essentially worked around the clock.  As his role at BLS was remote, and his job at Company A was hybrid, he was often able to split up the day accordingly.  Sometimes, however, Matthew used the sick leave he was granted at BLS in order to work in-office at Company A.  Although Matthew was not sick on those occasions, he represented to BLS that he was sick when he submitted and verified his time entries.  Of course, he knew his conduct was wrong and he takes full responsibility for it.

Unfortunately, Matthew's time at Company A was punctuated by the sudden death of his younger brother, Patrick—a loss that impacted Matthew significantly.  After Patrick's death, seeking even more distraction from reality, Matthew continued to work both jobs for the better part of a year.  Eventually, however, Matthew's ability to balance both roles became too onerous, despite the fact that he had managed to perform well in both positions.  Because of that—coupled with mounting regret for the choices he had made—Matthew decided to leave his job at BLS in July 2023.

In late October 2024, Matthew was approached by FBI agents in connection with this case. While Matthew was out of town at the time the agents first visited his home, he made sure to connect with them upon his return, a few days later.  Specifically, Matthew arranged to meet with the agents at a Residence Inn near his apartment in Manhattan on October 24, 2024.  At this meeting, which lasted just over an hour, Matthew was forthcoming and answered all of the agents'

questions.  He was honest about his overlapping time at BLS and Company A, and did not make any effort to conceal his conduct.  Over the months that followed, Matthew did nothing but cooperate with the Government's investigation, including taking full responsibility for his actions through his guilty plea.

On April 3, 2025, pursuant to a plea agreement with the government, Matthew pleaded guilty before Your Honor to one count of making false statements under Title 18, Section 1001 of the United States Code.  PSR ¶ 4; *see* ECF No. 8 (plea agreement).  This charge carries a maximum sentence of 5 years' imprisonment; a fine not to exceed $250,000 or twice the pecuniary gain or loss of the offense, pursuant to 18 U.S.C. § 3751(d); a term of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3583(b)(3); and an obligation to pay any applicable interest or penalties on fines and restitution not timely made. PSR ¶ 4.  Under the plea agreement, he has also agreed to pay restitution in the amount of $13,316.18, the sick leave compensation that was paid to him by BLS as a result of the false statements.  PSR ¶ 10.

Matthew's sentencing is scheduled for July 17, 2025, at 3:30 p.m.

## III.    Matthew's Personal Background and Characteristics

### A.    Upbringing, Education, and Mental Health

Matthew Hong was born on October 12, 1996, in Ann Arbor, Michigan as the second of three children to Chinese immigrants Tao and Jennifer Hong. PSR ¶ 43.  His parents set a high standard by their example.  His father, with a PhD in physics from Northwestern University, worked in finance well into his sixties, and his mother, with a Master's degree in computer science, worked as a software engineer for various financial institutions. PSR ¶¶ 43–45.  Their academic

and professional success and high expectations for their children translated into high pressure in Matthew's personal and professional life.

After moving several times in Matthew's early childhood, the Hong family settled in Short Hills, New Jersey, where Matthew later attended Millburn High School. PSR ¶¶ 49, 72. Matthew did well in school and participated in several extracurricular activities, including piano, competitive swimming, and Saturday schooling for Chinese language and culture. PSR ¶¶ 45, 74–75. Matthew's high school was extremely competitive, and the pressure to excel in each of his disciplines compounded. It was during his high school years that Matthew began to struggle with significant anxiety and depression. PSR ¶ 57.

Beginning in the fall of 2015, Matthew attended Washington University in St. Louis. PSR ¶ 72. Matthew originally pursued a pre-med academic track and had a work-study job involving 12-hour overnight shifts at a level-one trauma center. PSR ¶ 82. He described this as a difficult experience—seeing first-hand patients in various stages of trauma, including adolescent gun violence victims. These experiences dissuaded Matthew from pursuing a career in medicine but left a lasting impression.

Matthew graduated from college with a degree in Economics a semester late, in the winter of 2019, after taking time off due to his mental health worsening. PSR ¶¶ 57, 72–74. Specifically, Matthew took leave during his junior year to seek professional help, and enrolled in classes at Rutgers University, which was closer to home, for the 2018 spring and summer semesters. PSR ¶ 74. During this time, Matthew's mental state continued to decline. In the spring of 2018, Matthew attempted to take his own life. PSR ¶ 57. This, of course, was an incredible low point for Matthew and his family. While his parents did everything they could to care for their son and get him the help that he needed, Matthew knew he had to find the strength within himself to get his life back

on track—and he did.  The following fall semester, Matthew returned to Washington University to complete his undergraduate studies. PSR ¶ 72.  Since that time, Matthew has been in and out of treatment for his depression and anxiety. PSR ¶¶ 58–59, 61–63.

At times, Matthew's mental and emotional struggles have manifested through imposter syndrome, causing him to question his ability to succeed.  While this deep insecurity heavily contributed to the conduct underlying this case, Matthew knows that it does not excuse it.

### B.    Post-College Events

After graduating college in the spring of 2020—at the height of the COVID-19 pandemic— Matthew began working at BLS. PSR ¶¶ 14, 16.  Matthew joined as an economist in the Current Employment Statistics group that produced, among other things, the monthly estimates of non-farm employment numbers. PSR ¶ 15.  Due to the pandemic, Matthew worked at BLS remotely, first from his residence in Washington, D.C., where he had moved in anticipation of the new job. PSR ¶ 16.  He was never able to interact in person with his BLS colleagues, and, in June 2020, he moved back to his family home in Middlesex, New Jersey, while continuing to work remotely at BLS. *Id.*  Like for many during the pandemic, physically working alone was extremely isolating for Matthew, and further exacerbated his anxiety and depression.  Despite these circumstances, Matthew received positive feedback from his supervisors and in his performance reviews throughout his time at BLS, and was promoted to a GS-12 (having started as a GS-7) on the General Schedule pay scale by time he left in 2022.

Still, Matthew was unsure what his future would look like at BLS and wondered whether there might be another career path for him.  Consequently, in the fall of 2021, Matthew applied for a job at Company A.  Although he was not hired for the position for which he first applied, Company A reached out with an offer for another role in the spring of 2022.  By June 2022,

Matthew began work as a Senior Associate on Company A's Economic Scenarios and Analytics Team. PSR ¶ 17.

Matthew was excited to take on a new challenge, but deep insecurity about his innate ability, as well as his self-doubt and lack of confidence, led him to question whether he would be able to meet expectations in such a coveted and competitive role.  So, as a naïve 25-year-old, he kept his job at BLS while he began his new job at Company A to see if he could get his bearings before fully committing to a career in finance.  In his view, if he could not make the progress either required or desired at Company A, he could resort to his BLS position as a safety net.  That way, he could assuage his anxiety and garner the confidence to take this new, daunting path.

Sadly, four months into his time at Company A, on October 31, 2022, Matthew's younger brother, Patrick, was killed in a tragic accident while on his way home after a night out with friends in New York City.  While Matthew is close with his entire family, he was particularly close to Patrick.  Two years his junior, Patrick Hong was a second-year medical student at Rutgers New Jersey Medical School, and the two shared an apartment in Jersey City.

This tragic loss deeply impacted Matthew, and even today, he is grappling with the reality that his younger brother is gone.  But in the immediate aftermath, Matthew's way of grieving— or, more likely, a distraction from grieving—was to fully immerse himself in his work at both jobs. The more time was taken up by any work, the less time he had to be consumed by his thoughts and come to terms with his loss.  He withdrew from his social life and believed he could find comfort in what was familiar; not seeking to disrupt his routine further.  Although he never intended to hold both positions for as long as he did, after his brother's death, Matthew kept his head down and prolonged his dual employment for a few more months.  Eventually, however, Matthew came

to the realization that holding both jobs, each with growing responsibilities, had simply become untenable. Therefore, in July 2023, on his own accord, Matthew made the decision to leave BLS.

As reflected in the Statement of the Offense filed in this matter, by virtue of his position at BLS, Matthew had access to certain nonpublic information, known as Principal Federal Economic Indicators ("PFEI"), that was "subject to strict security procedures and safeguards that reflected the sensitivity of the PFEI and their ability to potentially affect financial markets if prematurely disclosed." *See* ECF No. 9, at 2. But it is important to note that Matthew never used or disclosed any nonpublic information to which he had access at BLS in connection with his job at Company A, and vice versa—not once—to the extent that information obtained through one role would even be relevant to the other. That was never his intent, and the Government has not provided any evidence to the contrary. Matthew's conduct in this case was wrong, and he takes full responsibility for it, but his intention was never to use these dual roles to obtain an advantage or otherwise profit in one job by misusing information from the other.

## C.    Current Situation

In January 2025, in connection with the events in this case, Matthew lost his job at Company A. However, instead of retreating from the world like he has done in the past, Matthew has been focused on improving his mental health and coming to terms with his new reality. He temporarily resides at his family's home in Metuchen, New Jersey, and plans to enroll in further mental health services as his financial situation improves. Also living at this home is his loving family, who continue to support him. In a letter submitted to the Court, Matthew's parents describe their relationship with Matthew as "built on greater honesty, vulnerability, and mutual respect" that reinforces their commitment to "support him as he moves forward and works to rebuild." *See* Letter from Jennifer and Tao Hong, attached hereto as Exhibit A. His older brother, Jeffrey,

describes their relationship as "com[ing] with a sense of duty" that compels him "to be a steady presence for Matthew" and "someone he could lean on when he needed guidance." *See* Letter from Jeffrey Hong, attached hereto as Exhibit B. Outside of home, Matthew also has a strong circle— both personal and professional—to support him. A friend of nearly a decade described Matthew as being "known for his kindness and unwavering capacity to support his friends and family." *See* Letter from Max Bergner, attached hereto as Exhibit C. A former Company A coworker also spoke of Matthew as a "standout contributor" who "consistently brought a positive attitude and was known for his reliability." *See* Letter from Utsav Shah, attached hereto as Exhibit D. Mr. Shah also said that Matthew is "someone who worked hard—perhaps too hard." *Id.*

Despite his missteps and the turmoil wrought by the fact that he now has a felony conviction, Matthew remains evermore hopeful and determined to carve out a successful career path for himself going forward. Since January, when he was fired from Company A, Matthew has been actively searching for and interviewing with prospective employers, and he is confident he will find a new path. Although he seeks to leave these days behind him, he will never forget the lessons he has learned. He is, indeed, more determined than ever.

## IV.    Sentencing

### A.    Overview of Sentencing Factors

In determining Matthew's sentence, the Court considers a broad range of statutory sentencing factors, along with the advisory Guidelines. *United States v. Booker*, 543 U.S. 220, 245–46 (2005); 18 U.S.C. § 3553(a) (2018). The Court must impose a sentence sufficient—but not greater than necessary—to achieve the goals of sentencing. 18 U.S.C. § 3553(a); *see Kimbrough v. United States*, 552 U.S. 85, 89 (2007); *Gall v. United States*, 552 U.S. 38, 55–57

(2007).  The goals of sentencing—as set forth in section 3553(a)(2)—are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2)(A)–(D).

In making an individualized assessment necessary to meet the goals of sentencing, the trial court must contemplate, consider, and give appropriate wright to the following factors: (1) the nature of the circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to meet the goals of sentencing listed above; (3) the kinds of sentences available; (4) the applicable sentencing Guidelines range; (5) the applicable Sentencing Commission (the "Commission") policy statements; (6) the need to avoid unwarranted sentencing disparities among defendants who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  *See* 18 U.S.C. § 3553(a)(1)–(7).

After determining the advisory Guidelines range, the trial court must next independently determine whether an appropriate sentence meets the goals of sentencing considering the section 3553(a) factors and must consider arguments that the advisory Guidelines should not apply on various policy- or case-specific grounds.  *See Rita v. United States*, 551 U.S. 338, 347–51 (2007). While a court is required to take account of the advisory Guidelines range together with other sentencing factors, it may not presume that such a range is reasonable.  *See Gall*, 552 U.S. at 50; *Nelson v. United States*, 555 U.S. 350, 351–52 (2009) (per curiam) ("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.") (emphasis original); *see also United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006) (hold that

"where, as here, the calculations under the guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations as set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences").

It is clear the Court will carefully evaluate all section 3553(a) factors and, consistent with that approach, individually apply all the factors to Matthew. We respectfully submit that these factors in concert support imposing a term of probation rather than any term of incarceration or home confinement.

**B.**     **The Section 3553(a) Factors**

      **1.**     **Nature and Circumstances of the Offense and History and Characteristics of Matthew Hong**

While Matthew's conduct in this case impugns his candor and integrity, a number of personal factors regarding Matthew and the nature and circumstances of the offense warrant important consideration by the Court. These include Matthew's lack of a criminal history, exacerbating personal and familial occurrences, his relative youth and the overall opportunity for personal growth.

         **a.**     **History and Characteristics of Matthew Hong**

Matthew has no criminal history. As set forth in the Plea Agreement, and reflected in the PSR, Matthew has no criminal history points, thus placing him in Criminal History Category I. PSR ¶ 37.

The lack of any criminal history should provide greater clarity into Matthew and his decisions in this case. He has an educational and professional background that emphasizes achievement under pressure. This pressure created insecurity that, despite his background,

reinforced his decisions leading to the instant offense. However, this background and support network should reassure the Court that Matthew would have little, if any, incentive to commit further criminal conduct. Matthew is young and just starting out, and has been faced with the possibility of imprisonment. This experience will no doubt leave a marked impact upon Matthew's outlook and interaction with the law, eliminating any risk of recidivism.

Matthew's decisions have weighed upon him tremendously from the start. It has been inimical to the values instilled in him from an early age: to lead a moral, ethical, and law-abiding life. He has admittedly strayed from those values, but these events have further reinforced the importance of those values for him. His remorse and sincere commitment to never repeating these errors can provide the Court assurance that he will live a law-abiding, and hopefully successful, life. He is committed to pursuing a bright future without letting his past hold him back.

### b.    Nature and Circumstances of the Offense

Matthew pleaded guilty to the crime of making false statements under 18 U.S.C. § 1001. In determining the appropriate sentence in this case, the Court should consider the circumstances under which Matthew committed the offense—the reckless actions of a young adult at his most vulnerable—and his steadfast commitment to lead a productive, law-abiding life now. With that said, Matthew does not wish to downplay the seriousness of his conduct, for which he has fully accepted responsibility through his guilty plea. It is worth emphasizing that Matthew's actions were not part of a broader scheme to defraud the United States, but rather a juvenile attempt to seek stability and confidence amid a continuing struggle with mental health. When Matthew used his BLS sick time when he was not sick in order to work a second job, he knew it was wrong. However, his better judgment was clouded by the fog of insecurity and debilitating self-doubt. With the time and clarity afforded to him to reflect on the gravity of his offense, however, Matthew

11

stands before this Court profoundly remorseful for his actions and focused on putting the past behind him.

### 2. Applicable United States Sentencing Guidelines Range

The Sentencing Guidelines offense level calculation by the Probation Department aligns with the calculation stipulated by the parties in the Plea Agreement, resulting in an offense level of 6, accounting for an adjustment for acceptance of responsibility, but before application of a Zero-Point Offender Adjustment under USSG § 4C1.1.  *See* PSR ¶ 6 (summarizing Plea Agreement calculation) *and* PSR ¶¶ 26-34 (Probation Department Offense level calculation).  The Probation Department has determined, and the defense agrees, that Matthew meets the criteria under USSG 4C1.1(a)(1)–(10) to qualify as a Zero-Point Offender, resulting in a further 2-level reduction, for a total offense level of 4.  PSR ¶¶ 33-34.  Because Matthew has no criminal history, he is in Criminal History Category I.  See PSR ¶ 37.  The resulting advisory guideline imprisonment range is zero to six months, within Zone A of the Sentencing Table.  PSR ¶ 107.

Further, because Matthew received a Zero-Point Offender Adjustment under USSG § 4C1.1, and the sentencing range is within Zone A, the Guidelines provide that a sentence other than a sentence of imprisonment is generally appropriate.  *See* USSG § 5C1.1, comment. (n. 10); PSR ¶ 108.

### 3. Purposes of Sentencing

The Court must ensure that Matthew's sentence meets certain purposes of sentencing, as set forth in 18 U.S.C. § 3553(a)(2)(A)–(D).  In particular, § 3553(a)(2)(A) provides that the sentence should "provide just punishment for the offense[,]" § 3553(a)(2)(B) provides that the sentence should "afford adequate deterrence to criminal conduct[,]" and § 3553(a)(2)(C) provides that the sentence should "protect the public from further crimes of the defendant[.]"

12

We respectfully submit that a sentence to a term of probation will provide a just and appropriately measured punishment for Matthew's offense. As set out in the Presentence Report, Matthew has no prior convictions, juvenile adjudications, or arrests. PSR ¶¶ 35-41. In fact, his interview with FBI agents during the investigation of this case was his first adverse encounter with law enforcement. While Matthew's poor decisions that ultimately led to his arrest and conviction in this case were substantially driven by his anxiety and self-doubt, rather than any pre-conceived criminal scheme, he has nonetheless accepted full responsibility for his actions. In addition, Matthew will have to bear the collateral consequences of his felony conviction, including the likely impediments to his professional employment for the remainder of his working life.

A term of probation would afford adequate deterrence to future criminal conduct and sufficiently protect the public from further crimes. This prosecution has already had a jarring and sobering impact on Matthew. A sentence of incarceration would not serve any specific or general deterrence in this case. Indeed, it would likely result in a significant setback not only to Matthew's efforts to secure employment, but more importantly, to the work he has already done to improve his mental health and stability. A term of probation would provide, through the Probation Department's supervision, additional structure and resources for Matthew on top of his own efforts to build a productive life. Matthew also benefits from a loving family and close friends that would provide the necessary support to further dissuade any potential criminal conduct. A term of probation, with its attendant conditions and supervision, would be sufficient punishment for the offense in this case, and would simultaneously provide Matthew with the opportunity to continue his efforts to pursue a brighter future, while reckoning with his past mistakes.

V.    <u>**Conclusion**</u>

Accordingly, for the foregoing reasons, the defense respectfully requests that the Court impose a sentence of probation.

Respectfully submitted,


<u>s/Kelly T. Currie</u>
Kelly T. Currie (*pro hac vice*)
Lisa Nicole Umans (*pro hac vice*)
kcurrie@crowell.com
lumans@crowell.com
CROWELL & MORING LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone: (212) 223-4000

*Attorneys for Matthew Hong*

Dated: July 10, 2025
       New York, New York

14